## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JULIA HAIR,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:15cv341 |
| | ) | **Electronic Filing** |
| **FAYETTE COUNTY OF** | ) | |
| **PENNSYLVANIA**, | ) | |
| **JEFFREY WHITEKO**, Individual, | ) | |
| **DOMINICK CARNICELLA**, Individual, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

September 13, 2017

## I.    INTRODUCTION

Plaintiff, Julia Hair ("Hair" or "Plaintiff") filed an Amended Complaint alleging: (1) Discrimination, Hostile Work Environment and Retaliation under the Rehabilitation Act against Defendant, Fayette County (the "County"); (2) Discrimination, Hostile Work Environment, and Retaliation under the Pennsylvania Human Relations Act (the "PHRA"), 43 PA. CONS. STAT. ANN. § 955 *et seq.,* against Defendants, Jeffrey Whiteko ("Whiteko") and Dominick Carnicella ("Carnicella"); (3) Hostile Work Environment, Discrimination and Retaliation under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, against the County; (4) Interference and Retaliation under the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601 *et. seq.*, against Whiteko and Carnicella; (5) violation of Civil Rights under 42 U.S.C. § 1983 against Whiteko and Carnicella; and (6) Intentional Infliction of Emotional Distress against Whiteko and Carnicella.  Hair filed a Motion for Partial Summary Judgment on her FMLA claims and the County Defendants filed a Motion for Summary Judgment.  Responses have been filed and the motions are now before the Court.

II.    STATEMENT OF THE CASE

Hair began employment with Fayette County on January 15, 1997, as a legal secretary in the Office of the Public Defender (the "Public Defender's Office" or the "Office"). Defendants' Concise Statement of Undisputed Material Facts ("Def. CSUMF") ¶ 1; Plaintiff's Concise Statement of Material Facts ("Pl. CSMF") ¶¶ 6 & 9[1].  The Public Defender's Office is located in the Fayette County Courthouse in Uniontown Pennsylvania. Def. CSUMF ¶ 2.  Hair was a member of the Service Employees International Union, Local 668, AFL-CIO (the "Union"). Def. CSUMF ¶ 4.

The Union entered into a Collective Bargaining Agreement ("CBA") with the County on January 1, 2010, and January 1, 2014. Def. CSUMF ¶ 5. Pursuant to the CBA, Hair's work schedule was from 8:30 a.m. until 4:00 p.m. with a one (1) hour lunch break from 12:00 p.m. until 1:00 p.m. and two (2) fifteen (15) minute breaks throughout the day. Def. CSUMF ¶ 6.  The CBA provides that an employee must notify the office before the start of the employee's regularly scheduled workday when the employee would be using sick leave. Def. CSUMF ¶ 7.

In October of 2008, Hair was diagnosed with breast cancer, which was treated and was in remission in or around the spring of 2013.  Def. CSUMF ¶ 11; Pl. CSMF ¶ 15. On September 23, 2013, Hair was examined Dr. Paul E. Means ("Dr. Means") for severe sunburn on her back and shoulders. Def. CSUMF ¶ 14; Def. Appdx. Ex. G. During the appointment, Dr. Means completed

---

[1]    Any Statement of Material Fact or Denial thereof without a proper citation to the record shall be of no effect. It is specifically noted that many of Plaintiff's Statements of Material Fact are cited to the Amended Complaint, or to Depositions or specific Bates Numbers that Plaintiff failed to make part of her Appendix.  It is not this Court's task to find documents not made part of the record.  Moreover, Paragraphs 46 through 49 and 51 through 56 of Plaintiff's Statements of Material Fact contain no citations to the record.

a form for intermittent leave under the FMLA because of recurring abdominal pain and Diabetes Mellutis Type II. Def. CSUMF ¶ 15; Def. Appdx. Ex. I; Pl. CSMF ¶ 20. The application provided no schedule for the requested intermittent leave. *Id.*

The procedure for obtaining FMLA leave in Fayette County required the requesting employee to provide a physician certification for review to determine if the condition was eligible for FMLA leave. Def. CSUMF ¶ 16. After the review, Human Resources would certify the FMLA request and meet with the requesting employee's manager to discuss accommodating the request. *Id.*

On October 10, 2013, Hair and her Union representative, Dennis Hull ("Hull"), met with Carnicella, the County's Human Resources Director, Public Defender Whiteko, and Office Coordinator, Debbie McGee ("McGee"). Def. CSUMF ¶ 17. The meeting was to discuss Hair's requested intermittent FMLA leave, attendance and attitude issues, and to request that Hair notify the office as far in advance as possible regarding when she would be using her FMLA leave. *Id.*; Pl. CSMF ¶ 22. At the meeting, Hair was also asked to return to her physician for clarity as to what her FMLA leave would entail. Def. CSUMF ¶ 18.

On October 15, 2013, Dr. Means supplemented the physician certification stating that Hair that Hair could be as late for work as 9:30 a.m. up to two (2) days per week and could be absent from work up to two (2) times per week. Def. CSUMF ¶ 19. Dr. Means then wrote a letter dated November 6, 2013, stating that Hair was "experiencing recurrent symptoms" which could cause her to be late for work "up to 9:30 a.m. and up to 5 days per week. She could also miss work . . . up to 2 days per week." Def. CSUMF ¶ 20; Def. Appdx. Ex. L.

By letter dated November 12, 2013, Carnicella notified Hair that she was approved for FMLA leave effective September 23, 2013. Def. CSUMF ¶ 21; Def. Appdx. Ex. M. Hair's intermittent leave was approved to the extent indicated by Dr. Means, that she "could be as late

for work as 9:30 a.m. up to 5 days per week depending on [her] symptoms and that [she] could miss up to 2 days of work per week due to this condition." *Id.* Carnicella's FMLA approval letter also provided:

> the County, for purposes of managing the operation, needs to be aware of when you will be coming to work. Since you have not requested a set schedule but rather hours or days which could differ every day of the week, the days which you are reporting to work after 8:00 am or will not be reporting at all, you are required to call the Office Coordinator or in her absence the Department Clerk 1, at 8 am and inform her if you will coming to work that day and if so, approximately when you will be arriving. If you are calling prior to 8 am for this purpose, instead of contacting the Office Coordinator, contact the Chief Public Defender on his cell phone . . . and leave him a message with the above required information. . .
>
> Regarding time off work for doctor appointments, please inform the Chief Public Defender in writing in as far as advance as possible of any upcoming work time that you need off for appointments and if they are pertaining to your FMLA or not. You must also provide me with verification from the treating physician of your attendance at these appointments.

Def. CSUMF ¶¶ 22 & 26; Def. Appdx. Ex. M.

On November 22, 2013, Jennifer Kondrla ("Kondrla"), a legal secretary in the Public Defender's Office, and Assistant Public Defender Mary Spegar ("Spegar") were involved in an incident with Hair. Def. CSUMF ¶ 31. Kondrla and Segar were looking for a file in the storage area of the office, often referring to the file by name, when after several minutes, Hair said "I can't make you suffer anymore," and told them where the file was located. *Id.* Kondrla and Hair then exchanged words about allowing Kondrla and Spegar to waste time looking for the file, about Hair's attitude and about employees snubbing each other in the office. *Id.* Kondrla told Hair that she was going to report her attitude problem to Human Resources, and Hair told Kondrla to just "sit in her hole" and "shut up". *Id.*; Def. Appdx. Exs.Q, R, S & T. Kondrla and Hair filed complaints with Human Resources against each other over the incident. Def. CSUMF ¶ 32.

On November 25, 2013, Hair met with Carnicella regarding the FMLA approval letter and indicated that she did not believe she had to verify her attendance at her doctor's appointments or to call when she will be late as required in the approval letter[2]. Def. CSUMF ¶ 35. On November 26, 2013, Whiteko sent Hair a memo reminding her of the policy that required her to call in no later than 8:00 am if she was going to be late or absent. Def. CSUMF ¶ 36. Whiteko also indicated that if she would not abide by this guideline, he would write her up. *Id.* Whiteko, further, told Assistant Public Defender, Charity Krupa, that Hair was a "cancer in the office, constantly disrupting." Pl. CSMF ¶ 31.

On December 5, 2013, Whiteko issued Hair a verbal warning for failing to abide by the requirements of the office attendance policy by arriving late without notifying the office on several dates prior to her FMLA leave. Def. CSUMF ¶ 37; Def. Appdx. Ex. X. Whiteko also issued Hair a written warning on that same day for arriving late for work on several days after the commencement of her FMLA leave and failing to notify the office that she would be late. *Id.* Whiteko counseled Hair that she must "inform [him] in as far in advance as possible if [she was] going to be late or need to leave early, but no later than the beginning of that work day." *Id.*

Hair filed a Union grievance regarding the warnings issued by Whiteko on December 5, 2013, concerning her failure to notify the office when she would be late. Def. CSUMF ¶ 40. Hair contended that she was not counseled in a timely manner, and was not given an opportunity to correct the issues prior to receiving progressive discipline steps. *Id.*

On the morning of December 6, 2013, Hair stepped out of the Public Defender's Office, and McGee and Kondrla spotted a camera that they believed was set up by Hair to record

---

[2] Hair had previously told Whiteko that she believed she did not have to call the office unless she was arriving for work after 9:30 a.m. Def. CSUMF ¶ 33.

them in the office. Def. CSUMF ¶ 38. Kondrla made a complaint to Whiteko contending that Hair had a video recorder on her desk which violated the confidentiality required in the Public Defender's Office with regard to their clients. Def. CSUMF ¶ 39. Whiteko forwarded Kondrla's complaint to Human Resources, and on December 9, 20133, Hair was suspended with pay pending an investigation of the video recorder incident. Def. CSUMF ¶¶ 41 & 42.

On December 13, 2013, Carnicella notified Hair that her use of a video recorder on December 6, 2013, may have violated County policy and the Pennsylvania Wire Tap Law. Def. CSUMF ¶ 44. Further, Carnicella indicated that her comments made to Kondrla on November 22, 2013, also may have violated County policy. *Id.* The County, therefore, would hold a Loudermill hearing at which she would be able to address the allegations. *Id.*

The County held the Loudermill hearing on December 20, 2013. Def. CSUMF ¶ 45. As a result of the hearing, Hair was issued a one day unpaid suspension for her comment "sit in your hole and shut up" directed at Kondrla. Def. CSUMF ¶ 46. Hair was directed to return to work on January 6, 2014. *Id.* Moreover, on January 27, 2014, Human Resources informed Hair that there was insufficient evidence to prove that the video recorder she allegedly set-up on her desk was turned on, therefore she was cleared of the allegations regarding the video recorder.[3] Def. CSUMF ¶ 47.

---

[3] The Union filed a grievance for the disciplinary actions received by Hair on December 5, 2013, and the one (1) day unpaid suspension received on January 3, 2014. By memorandum Agreement between the Union and the County, the verbal and written warnings were rescinded, the one (1) day unpaid suspension was converted into a verbal warning, and Hair was reimbursed one (1) day's pay for the suspension. Def. Appdx. Ex. VVV.

On January 9, 2014, Hair filed a complaint with Human Resources stating that "tart burners"[4] were being used in the office and the scent was giving her headaches and bothering her stomach. Def. CSUMF ¶ 48.  On January 13, 2014, Hair was notified that the use of tart burners would be discontinued in the office or she would be moved to an area of the office in which she was not bothered by the scent for the next 15 days pending a physician certification that such sensitivity qualified as disability under the ADA. Def. CSUMF ¶ 50.

Hair visited Dr. Means on January 22, 2014, and Dr. Means completed a Physician's certification that indicated Hair was not disabled but was sensitive to substances in the work environment, which included tart burners. Def. CSUMF ¶ 53.  On January 23, 2014, Hair was examined by Robert S. Gorby, M.D. ("Dr. Gorby") at Westmoreland Allergy & Asthma Associates regarding her sensitivity to perfumes, candles and strong scents. Def. CSUMF ¶ 54. Dr. Gorby found no evidence of hypersensitivity, but explained that "it is quite possible that things at work are bothering quite a bit and . . . it would be helpful if her place of employment could limit the amount of perfumes, cleaning fluids, smoke from candles, etc." *Id.* Nonetheless, on February 14, 2014, the Fayette County Commissioners approved an accommodation for Hair in which the use of tart burners and scented candles would be discontinued within the Public Defender's Office.  Def. CSUMF ¶ 58. On March 6, 2014, the County notified Hair that her requested accommodation was approved and that the use of tart burners, air fresheners and scented candles would be permanently discontinued during her employment in the office. Def. CSUMF ¶ 62.

---

[4]     A "tart burner" heats scented wax which produces an aroma, similar to a scented candle, but without the open flame. Def. CSUMF ¶ 49.

By letter dated January 27, 2014, Hair was notified that a Loudermill Hearing was scheduled for January 30, 2014, to respond to allegations that she refused to answer phones in the office, slept at her desk, glared at her co-workers and failed to notify co-workers of when she would leave the office. Def. CSUMF ¶ 56. Following the hearing, Hair was issued a written warning for violating County policy by intimidating employees, misusing County time, failing to follow the chain of command, failing to perform job duties, unauthorized absence from work station/area during the workday and for unprofessional behavior. Def. CSUMF ¶ 57; Def. Appdx. Ex. RR.

On March 4, 2014, Debbie McGee filed a Workplace Harassment Complaint Form against Hair alleging that she was attempting to provoke an altercation and was acting threatening and intimidating. Def. CSUMF ¶ 61. Specifically, McGee complained that Hair made comments to her throughout the day, stared and/or glared at her, refused to perform job tasks, refused to follow scheduling rules and continually attempts to bully and intimidate her. *Id.*; Def. Appdx. Ex. WW. Kondrla also filed a Workplace Harassment Complaint Form against Hair in March of 2014, alleging that Hair made comments to her, stared and smirked at her, and refused to answer the telephone. Def. CSUMF ¶ 65.

A Loudermill hearing was scheduled for March 24, 2014, regarding the allegations of McGee and Kondrla. Hair admitted that she would not answer the telephone in the office, and opined that she did not have to take her breaks in accordance with the break schedule. Def. CSUMF ¶¶ 66 & 67. Based upon her admissions, Hair received a one (1) day unpaid suspension for intimidating employees, unsatisfactory performance of job duties, misuse of County time, refusal to perform assignments, failing to abide by office hours and break times and unprofessional communications in the office. Def. CSUMF ¶ 68; Def. Appdx. Ex. CCC.

On May 6, 2014, the Public Defender's Office implemented a sign in/sign out sheet for its employees. Def. CSUMF ¶ 72; Def. Appdx. Ex. GGG. All Union employees in the Public Defender's Office were required to use the sign in/sign out sheet. Def. CSUMF ¶ 74. Hair at times did not follow the Office procedures. Def. Appdx. Ex. OOO. The Union told Hair that the procedures she was being asked to follow in the Office were within Management's rights. *Id.*

On June 10, 2014, Hair and her Union Representative met with Human Resources to discuss issues in the Public Defender's Office regarding Hair and the Office procedures. Def. CSUMF ¶ 87. At the meeting, the parties agreed to the following:

    a.     the temperature in the office would remain at 72 degrees during the summer months;

    b.     the sign in/sign out sheet would be kept in a neutral area in the office and that if employees were signing out for a break, the employees would just have to state that they were taking a break, not where they were going during their break;

    c.     Whiteko would collect the Time Off Request Forms, Whiteko would handle all discipline of Hair, and Hair would keep track of her own timesheets; and

    d.     interviews of Public Defender clients would only be conducted in the back offices and not at desks in the main office to ensure confidentiality.

*Id.*; *See also* Def. Appdx. Ex. HHH.

Despite the agreement, Hair violated the Office procedures regarding the temperature of the Office and the procedure regarding interviewing clients at her desk. Def. CSUMF ¶¶ 88 & 89; Def. Appdx. Ex. OOO. Whiteko issued a written warning to Hair for such violations. Def. Appdx. Ex. KKK. Further, on June 26, 2014, Hair saw McGee in the Courthouse hallway, raised her voice, pointed at McGee and told McGee to stop following her. Def. CSUMF ¶ 90. McGee alleged Hair left the Office without signing out, and she was unaware Hair was in the Courthouse. Def. CSUMF ¶ 91.

On June 26, 2014, Carnicella issued a Loudermill Hearing Notice suspending Hair with pay effective June 27, 2014, pending the results of the investigation of the altercation with McGee, and scheduling the hearing for June 30, 2014. Def. CSUMF ¶ 92. At the hearing, Hair admitted that she did not use the sign out sheet, and also admitted that she told McGee to stop following her. Def. CSUMF ¶ 93.

Because of Hair's "continued inappropriate action," Carnicella recommended to the Commissioners that Hair undergo an Employee Assistance Program ("EAP") evaluation and that she be placed on unpaid suspension until she completes the EAP. Def. CSUMF ¶ 94. The Fayette County Commissioners accepted the recommendation and issued Hair an unpaid suspension pending completion of an EAP. Def. CSUMF ¶ 95. Hair was notified of such disciplinary action on July 23, 2014. Def. CSUMF ¶ 96.

Because the Union believed that mandatory EAP was not part of the progressive discipline policy set forth in the CBA, Hair initially refused to attend mandatory EAP. Def. CSUMF ¶ 97; Def. Appdx. Ex. N (Cindric Depo. pp. 64-67). Hair, however, agreed to voluntarily attend EAP counseling. *Id.*

In discussions with Carnicella, Hair's Union Representative, Rose Cindric ("Cindric"), advocated the need to have Hair relocated to another County office. Def. Appdx. Ex. N (Cindric Depo. pp. 36-37, 67-68). Hair was transferred to the Fayette Area Coordinated Transportation ("FACT") Office on August 28, 2014, as a Transportation Information Specialist. Def. CSUMF ¶ 104; Def. Appdx. Ex. N (Cindric Deposition at pp. 36-37, 67-68).

On October 8, 2014, Hair submitted a resignation letter to the FACT Office citing continued harassment and duress. Def. CSUMF ¶ 107; Def. Appdx. Ex. UUU.

**III. LEGAL STANDARD FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id.* The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay*

*Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

These rules apply with equal force to cross-motions for summary judgment. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). When confronted with cross-motions for summary judgment, as in this case, the Court considers each motion separately. *See Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 150 (3d Cir. 1993) (noting that concessions made for purposes of one party's summary judgment motion do not carry over into the court's separate consideration of opposing party's motion).

## IV.    DISCUSSION

### A.    The Rehabilitation Act

The Rehabilitation Act of 1973 (the "Act") prohibits discrimination on the basis of disability in programs receiving federal financial assistance. Section 504 provides, in relevant part, that:

> (a) No otherwise qualified individual with a disability in the United States, as defined in [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794 (a). The Act defines the term "program or activity" as follows:

> (b) "Program or activity defined." For purposes of this section, the term "program or activity" means all of the operations of —
>
>> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>>
>> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

12

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section 7801 of Title 20), system of vocational education, or other school system;

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship-

(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended federal financial assistance.

29 U.S.C. § 794(b). The Act, therefore, applies only to programs or entities which receive federal funds. *See U.S. Dept. of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986); *see also Koslow v. Commw. of Pa.*, 302 F.3d 161, 171 (3d Cir. 2002) ("[I]f a state accepts federal funds **for a specific department or agency**, it voluntarily waives sovereign immunity for Rehabilitation Act claims against the department or agency — but **only against that department or agency**")(emphasis added). Acceptance of such funds obligates an entity to comply with the requirements of the Act and exposes the entity to liability for violating the Act. *U.S. Dept. of Transp. v. Paralyzed Veterans of Am*, 477 U.S. at 605.

In order to assert a claim under the Act, Hair must show that: (1) she is an individual with a disability; (2) she is otherwise qualified for participation in the program or activity, or for the potion sought; (3) she was excluded from the position sought, denied the benefits of, or subject

to discrimination under the program or activity "solely by reason of his [or her] disability"; and (4) the relevant program or activity receives federal financial assistance. *See Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1009 (3d Cir. 1995); *Strathie v. Dep't of Transp.*, 716 F.2d 227, 230 (3d Cir. 1983)).

The term "Federal financial assistance" is not defined under the Act, however, the regulations promulgated by the United States Department of Health and Human Services provide the following interpretation:

> (h) Federal financial assistance means any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the Department provides or otherwise makes available assistance in the form of:
>
> > (1) Funds;
> >
> > (2) Services of Federal personnel; or
> >
> > (3) Real and personal property or any interest in or use of such property, including:
> >
> > > (i) Transfers or leases of such property for less than fair market value or for reduced consideration; and
> > >
> > > (ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government.

45 C.F.R. § 84.3(h).

Other federal courts in the Third Circuit have previously applied 45 C.F.R. § 84.3(h) to determine whether a plaintiff has adequately pleaded sufficient facts to infer that a defendant receives "Federal financial assistance." *See Sos v. Mack Trucks, Inc.*, 1991 U.S. Dist. LEXIS 5407 at *15 (E.D. Pa. Apr. 23, 1991) (finding that because "the plaintiff has offered no evidence that [defendant] has any links with federal funding which would bring it within the scope of the Act . . . to put off the resolution of this case for more fishing expeditions by the plaintiff would

serve no purpose"), *aff'd*, 950 F.2d 723 (3d Cir. 1991); *Martin v. Delaware Law Sch. of Widener Univ.*, 625 F. Supp. 1288, 1298 (D. Del. 1985) ("Plaintiff has not alleged that [Defendant] receives any federal financial assistance, or operates any program or activity receiving federal financial assistance, within the meaning of Section 794. Therefore, Plaintiff does not state a claim under Section 794 upon which relief may be granted."), *aff'd*, 884 F.2d 1384 (3d Cir. 1989).

In this instance, Hair must establish that the Fayette County Public Defender's Office receives federal financial assistance. *Taylor v. Altoona Area Sch. Dist.*, 513 F. Supp. 2d 540, 558 (W.D. Pa. 2007) (citing *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002)) ("Section 504 applies to federal financial assistance recipients."). Hair argues that there is a question of fact as to whether the Rehabilitation Act applies because the County allegedly receives federal funds and assumes both the Public Defender's Office and the FACT office are recipients of such funds. *See* Hair's Brief in Opposition p. 4. Hair, however, fails to direct this Court to any evidence in the record that either Fayette County or its Public Defender's Office receive federal financial assistance. Accordingly, summary judgment will be entered in favor of Fayette County on Hair's claims of Discrimination, Hostile Work Environment and Retaliation under the Rehabilitation Act.

B.     <u>Discrimination Under the ADA and PHRA</u>

In her Amended Complaint Hair alleges discrimination under the PHRA against Whiteko and Carnicella (Count IV) and Discrimination under the ADA against the County (Count VII)[5].

---

[5]     The Court will analyze the claims together because Hair's PHRA claim in Count IV of the amended complaint is premised upon the same allegations of disability discrimination that serve as the basis of her ADA claim in Count VII. *See* Am. Compl. ¶¶ 50-63 and 80-93.

Hair contends that her requests for accommodation constituted "protected activity" under both federal and state law, and that Defendants discriminated against her on account of such protected activity by:

> (1)     Failing to provide Hair with reasonable accommodations during her employment, i.e. disallowing her to have a fan at her desk, disallowing her to open the windows in the building when she needed air, refusing to permit time off when she had FMLA approval to do so, and disciplining her for using FMLA;
>
> (2)     Failing to properly respond to Hair's requests for accommodations;
>
> (3)     Failing to properly investigate Hair's requests for accommodations, FMLA, or of notifying her of her rights under the law;
>
> (4)     Subjecting the Hair to continuing harassment, abuse and inappropriate pressure in the workplace including *inter alia* coworkers talking about her amongst themselves about her medical issues, coworkers constantly monitoring all of Hair's actions throughout the day, coworkers texting one another and their supervisor about Hair, and suspensions of Hair;
>
> (5)     Falsely accusing Hair of misconduct and/or inappropriate behavior at work in an effort to retaliate against Hair;
>
> (6)     Subjecting Hair to an unreasonable amount of written disciplinary actions, monitoring, and adversarial meetings, even some disguised as meetings regarding her health issues in which she was also disciplined.

*See* Am. Compl. ¶¶ 61 & 91.  Because the accusations at numbers 4, 5 and 6 above are more properly analyzed under either hostile environment and/or retaliation claims, the Court will focus on Hair's failure to accommodate claims and will address the two claims collectively under the rubric of ADA principles. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (noting that "the [Rehabilitation] Act, ADA, and PHRA . . . are all to be interpreted consistently," and that "all have the same standard for determination of liability").

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

16

compensation, job training, and other terms, conditions, and privileges of employment." 42

U.S.C. § 12112 (a).  The Act defines a "qualified individual with a disability" as "an individual

with a disability who, with or without reasonable accommodation, can perform the essential

functions of the employment position that individual holds or desires." 42 U.S.C. § 12111(8)[6].

An employer discriminates against a qualified individual when it does "not make reasonable

accommodations to the known physical or mental limitations of the individual unless the

[employer] can demonstrate that the accommodation would impose an undue hardship on the

operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A). "Reasonable

accommodation" means measures such as "job restructuring, part-time or modified work

schedules, reassignment to a vacant position, acquisition or modification of equipment or

devices, … and other similar accommodations for individuals with disabilities." 42 U.S.C.  §

12111(9).

     To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show:

(1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to

perform the essential functions of the job, with or without reasonable accommodations by the

employer; and (3) she has suffered an adverse employment decision as a result of discrimination.

*Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). In the context of a "failure-to-

---

[6]    Congress substantially modified the standard for establishing a "disability" under the ADA
when it enacted the ADA Amendments Act of 2008 ("ADAAA""). *See* Pub. L. No. 110-325, 122
Stat. 3553 (codified in various provisions of 42 U.S.C. §§ 12101 et seq.). Because the PHRA has
not been similarly amended, some courts have concluded that PHRA claims must be separately
analyzed, at least with respect to issues concerning a claimant's "disability." *See, e.g., Szarawara
v. Cnty. of Montgomery*, 2013 U.S. Dist. LEXIS 90386, *7 (E.D. Pa. June 27, 2013) ("[T]he
PHRA has not been similarly amended, necessitating separate analysis of Plaintiff's ADA and
PHRA claims.").  For present purposes, it does not appear that Defendants are challenging Hair's
ability to demonstrate a "disability" under either the ADA or the PHRA, therefore the changes
made by the ADAAA to the ADA standards does not affect the Court's analysis of the PHRA
claim in this case.

accommodate" claim, the "adverse employment decision" is the refusal to make reasonable accommodations for a plaintiff's disability. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004); *Ballard-Carter v. Vanguard Group, Inc.*, 2016 U.S. Dist. LEXIS 97512, at *31 (E.D. Pa. July 26, 2016). Defendants argue that Hair's claims fail on the third element because Defendants did not discriminate against her by failing to reasonably accommodate or otherwise.

To prove a failure to accommodate, Hair must show: (1) the employer knew about her disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist her in seeking accommodations; and (4) Hair could have been reasonably accommodated but for the employer's lack of good faith. *Evans v. Cernics, Inc.*, 2016 U.S. Dist. LEXIS 108141, *29-30 (W.D. Pa. Aug. 16, 2016) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319-20 (3d Cir. 1999)).

In this instance, the alleged failures to accommodate include disallowing Hair to have a fan at her desk, disallowing her to open the windows in the building when she needed air, refusing to permit time off when she had FMLA approval to do so, and disciplining her for using FMLA. Am. Comp. ¶¶ 61(a), 91(a). Hair also contends that Defendants failed to "properly respond" and "investigate" her requests for accommodation. Am. Comp. ¶¶ 61(b) & (c), 91(b) & (c). The undisputed facts, however, belie Hair's contentions.

On September 23, 2013, Dr. Means completed a form for intermittent leave under the FMLA because of recurring abdominal pain and Diabetes Mellutis Type II. Def. CSUMF ¶ 15; Def. Appdx. Ex. I; Pl. CSMF ¶ 20. On October 10, 2013, Hair and her Union representative, Dennis Hull ("Hull"), met with Carnicella, the County's Human Resources Director, Public Defender Whiteko, and Office Coordinator, Debbie McGee ("McGee"). Def. CSUMF ¶ 17. The meeting was to discuss Hair's requested intermittent FMLA leave, attendance and attitude issues,

and to request that Hair notify the office as far in advance as possible regarding when she would be using her FMLA leave. *Id.*; Pl. CSMF ¶ 22. At the meeting, Hair was also asked to return to her physician for clarity as to what her FMLA leave would entail. Def. CSUMF ¶ 18.

On October 15, 2013, Dr. Means supplemented the physician certification stating that Hair could be as late for work as 9:30 a.m. up to two (2) days per week and could be absent from work up to two (2) times per week. Def. CSUMF ¶ 19. Dr. Means then wrote a letter dated November 6, 2013, stating that Hair was "experiencing recurrent symptoms" which could cause her to be late for work "up to 9:30 a.m. and up to 5 days per week. She could also miss work . . . up to 2 days per week." Def. CSUMF ¶ 20; Def. Appdx. Ex. L.

By letter dated November 12, 2013, Carnicella notified Hair that she was approved for FMLA leave effective September 23, 2013. Def. CSUMF ¶ 21; Def. Appdx. Ex. M. Hair's intermittent leave was approved to the extent indicated by Dr. Means, that she "could be as late for work as 9:30 a.m. up to 5 days per week depending on [her] symptoms and that [she] could miss up to 2 days of work per week due to this condition." *Id.* Because the leave was "intermittent", Carnicella required that, on the days which Hair was reporting to work after 8:00 am or would not be reporting at all, she call the Office Coordinator or in her absence the Department Clerk 1, at 8 am and inform her if she was coming to work that day and if so, approximately when she would be arriving. Def. CSUMF ¶¶ 22 & 26; Def. Appdx. Ex. M.

On January 9, 2014, Hair filed a complaint with Human Resources stating that "tart burners" were being used in the office and the scent was giving her headaches and bothering her stomach. Def. CSUMF ¶ 48. On January 22, 2014, Dr. Means completed a Physician's certification that indicated Hair was not disabled but was sensitive to substances in the work environment, which included tart burners. Def. CSUMF ¶ 53. On January 23, 2014, Hair was examined by Robert S. Gorby, M.D. ("Dr. Gorby") at Westmoreland Allergy & Asthma

Associates regarding her sensitivity to perfumes, candles and strong scents. Def. CSUMF ¶ 54. Dr. Gorby found no evidence of hypersensitivity, but explained that "it is quite possible that things at work are bothering quite a bit and . . . it would be helpful if her place of employment could limit the amount of perfumes, cleaning fluids, smoke from candles, etc." *Id.* On February 14, 2014, the Fayette County Commissioners approved an accommodation for Hair in which the use of tart burners and scented candles would be discontinued within the Public Defender's Office. Def. CSUMF ¶ 58. On March 6, 2014, the County notified Hair that her requested accommodation was approved and that the use of tart burners, air fresheners and scented candles would be permanently discontinued during her employment in the office. Def. CSUMF ¶ 62.

On February 26, 2014, Hair saw Physician Assistant Jill R. Piccolo who provided Hair with a prescription to allow Plaintiff to wear sneakers to work due to her knee and leg pain. Def. CSUMF ¶ 59; Def. Appdx. Ex. UU. There were no further issues regarding Hair wearing sneakers to work. Def. CSUMF ¶ 60. With regard to the temperature in the office, Hair never sought an accommodation for any condition requiring that she be permitted to work in an environment below the state regulated temperatures. Def. CSUMF ¶ 81. Nonetheless, Hair was permitted to use a desk fan in order to cool her area of the office. Def. CSUMF ¶ 83. Even then, Hair pushed the limits of such permission. See Def. CSUMF ¶¶ 84 & 85.

Moreover, there is no evidence that Hair was disciplined for using FMLA leave. To the contrary, Hair was disciplined for her refusal to inform the Office when she was going to use, or when she in fact needed, FMLA leave. Hair did not believe she was required to verify her attendance at her doctor's appointments or to call when she was going to be late as required in the approval letter. Def. CSUMF ¶ 33 & 35.

The ADA does not, however, require an employer to provide a disabled employee with the accommodation of her choosing. *Diaz v. City of Philadelphia*, 565 Fed. Appx. 102, 106 (3d

Cir. 2014); (citing *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800-01 (6th Cir. 1996) ("an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided")); see also *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68-69 (1986)). Accordingly, neither the County nor the individual Defendants violated the ADA or PHRA by failing to accommodate Hair's alleged disabilities.

 C. <u>Hostile Work Environment Under the ADA and PHRA</u>

 In her Amended Complaint Hair alleges she was subjected to a hostile work environment in violation of the PHRA against Whiteko and Carnicella (Count V) and in violation of the ADA against the County (Count VIII)[7]. The alleged harassment Hair complains of includes the intentional, repeated and continuous mistreatment by coworkers when they would: (1) talk amongst themselves about her and her medical issues; (2) text one another about her; (3) text their supervisor about her; and (4) keep track of her activities at all times of the day. Am. Compl. ¶¶ 67 & 97.

 The ADA states that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Supreme Court has held that language in Title VII that is almost identical to the above language in the ADA creates a cause of action for a hostile work environment. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989). Moreover, the Third Circuit has recognized that:

> in the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose--to prohibit discrimination in employment against

---

[7] The Court will analyze the claims together because Hair's PHRA claim in Count V of the amended complaint is premised upon the same allegations that serve as the basis of her ADA claim in Count VIII. *See* Am. Compl. ¶¶ 64-72 and 94-102.

members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well.

*Walton v. Mental Health Ass'n*, 168 F.3d 661, 666 (3d Cir. 1999) (quoting *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir. 1995)). The Court further found that "this framework indicates that a cause of action for harassment exists under the ADA." *Walton v. Mental Health Ass'n*, 168 F.3d at 666.

A claim for harassment based on disability requires that Hair show: (1) she is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that Defendants knew or should have known of the harassment and failed to take prompt effective remedial action. *Walton v. Mental Health Ass'n*, 168 F.3d at 6667 (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)).

To prove a hostile work environment claim, Hair must show, *inter alia*, that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Factors which may indicate a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment."

22

*Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). In assessing the severity of alleged discriminatory treatment, "we consider the totality of the circumstances," and our analysis "must concentrate not on individual incidents, but on the overall scenario." *Id.* at 262-263.

There is no evidence in the record that Hair's coworkers made comments regarding her medical condition. Nor does Hair direct this Court to any evidence in the record regarding texting by her coworkers about her or her medical condition. Moreover, the incidents described by Hair, which are not supported by the record, do not rise to the level necessary to sustain a hostile work environment claim[8]. Accordingly, summary judgment will be entered in favor of the County and the Individual Defendants on Hair's claims of Hostile Work Environment under the ADA and PHRA.

D.    FMLA Interference

The FMLA was enacted to allow "employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). The Act grants eligible employees the right to take up to twelve workweeks of leave in any twelve-month period if a "serious health condition . . . makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). At the end of the leave period, the employee has the right to be restored to her former position or an equivalent position. 29 U.S.C. § 2614(a)(1).

An eligible employee that falls under 29 U.S.C. § 2612(a)(1)(C) or(D) may be entitled to take FMLA leave intermittently:

> on a reduced scheduled when medically necessary. The taking of leave
> intermittently or on a reduced leave schedule … shall not result in a reduction in

---

[8]    There is evidence in the record, however, of Workplace Harassment Complaints filed against Hair.

> the total amount of leave to which the employee is entitled … beyond the amount
> of leave actually taken.

29 U.S.C. § 2612(b). The phrase "intermittent leave" is defined under the implementing

regulations as "leave taken in separate periods of time due to a single illness or injury, rather than

for one continuous period of time, and may include leave of periods from an hour or more to

several weeks." 29 C.F.R. § 825.800.

Three provisions collectively form the basis of liability under FMLA. Two subsections of

29 U.S.C. § 2615(a), entitled "Interference with [FMLA] rights," state:

> (1) Exercise of rights
>
> It shall be unlawful for any employer to interfere with, restrain, or
> deny the exercise of or the attempt to exercise, any right provided
> under this subchapter.
>
> (2) Discrimination
>
> It shall be unlawful for any employer to discharge or in any other
> manner discriminate against any individual for opposing any
> practice made unlawful by this subchapter.

Further, employers are prohibited from "discriminating against employees or prospective

employees who have used FMLA leave." 29 C.F.R. § 825.220(c). Retaliation claims, such as the

one set forth in this instance, arise under on § 825.220(c). *Erdman v. Nationwide Ins. Co.*, 582

F.3d 500, 508 (3d Cir. 2009).

Interference claims are based on the FMLA regulations which explain that an employer

interferes with the employee's rights by refusing to authorize FMLA leave or discouraging an

employee from using such leave. 29 C.F.R. § 825.220(b); *see also* 29 U.S.C. § 2615(a)(1). A

plaintiff need not, however, establish that she was treated differently than others and, unlike a

case in which the plaintiff is pursuing a claim for discriminatory retaliation, the defendant cannot

escape liability by providing a "legitimate business purpose" for the decision. *Callison v. City of*

*Phila.*, 430 F.3d 117, 120 (3d Cir. 2005) ("An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.")

In order to make a claim of interference under the FMLA, Hair must establish that: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice to Defendants of her intention to take FMLA leave; and (5) Hair was denied benefits to which she was entitled under the FMLA. *Ross v. Gilhuly*, 755 F.3d 185, 191-192, (3d Cir. 2014) (citing *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008)); *see also Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006). The scope of what constitutes interference is described in the applicable regulations as follows: "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Johnson v. Cmty. College of Allegheny County*, 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008) (quoting 29 C.F.R. § 825.220(b)).

Hair was granted her intermittent FMLA leave, as certified by Dr. Means, on November 12, 2013, and such leave was effective September 23, 2013. Def. CSUMF ¶ 21; Def. Appdx. Ex. M. The FMLA approval letter additionally provided:

> the County, for purposes of managing the operation, needs to be aware of when you will be coming to work. Since you have not requested a set schedule but rather hours or days which could differ every day of the week, the days which you are reporting to work after 8:00 am or will not be reporting at all, you are required to call the Office Coordinator or in her absence the Department Clerk 1, at 8 am and inform her if you will coming to work that day and if so, approximately when you will be arriving. If you are calling prior to 8 am for this purpose, instead of contacting the Office Coordinator, contact the Chief Public Defender on his cell phone . . . and leave him a message with the above required information. . .
>
> Regarding time off work for doctor appointments, please inform the Chief Public Defender in writing in as far as advance as possible of any upcoming work time that you need off for appointments and if they are pertaining to your

> FMLA or not. You must also provide me with verification from the treating
> physician of your attendance at these appointments.

Def. CSUMF ¶¶ 22 & 26; Def. Appdx. Ex. M.

Following her approval for FMLA leave, Hair contends that in effort to discourage and
interfere with her use of FMLA, she was scrutinized repeatedly regarding whether she had
followed the notice requirements set forth in the FMLA approval letter. Hair further contends
that the notice requirements "added a higher burden for [her] then [sic] contemplated by the Act
by requiring her to comply with an employer policy which exceeded the required time frames
found in the Act and regulations". Hair Brief in Support p. 6.

All FMLA leave, whether intermittent or not, falls into two categories: foreseeable
intermittent leave and unforeseeable intermittent leave. The degree of notice required to be given
to an employer depends upon whether the leave is foreseeable. If intermittent leave is
foreseeable, an employee is required to give the employer 30 days advance notice, or, if 30 days
advance notice is impossible under the circumstances, notice must be given as soon as
practicable. 29 U.S.C. § 2612(e)(1); 29 C.F.R. § 825.302. The phrase "as soon as practicable" is
defined under the regulations "as soon as both possible and practical, taking into account all of
the facts and circumstances in the individual case …. [and] ordinarily would mean at least verbal
notification to the employer within one or two business days of when the need for leave becomes
known to the employee." 29 C.F.R. § 825.302(b). If leave is unforeseeable, an employee must
give notice to the employer within one or two days of learning of the need for leave, except
where extraordinary cases prevent such notice. 29 C.F.R. § 825.303. The regulations with
respect to unforeseeable leave further state:

> in the case of a medical emergency requiring leave because of an employee's own
> serious health condition or to care for a family member with a serious health
> condition, written advance notice pursuant to an employer's internal rules and
> procedures may not be required when FMLA leave is involved.

*Id.*

Hair's intermittent leave was approved to the extent indicated by Dr. Means, that she "could be as late for work as 9:30 a.m. up to 5 days per week depending on [her] symptoms and that [she] could miss up to 2 days of work per week due to this condition." Def. CSUMF ¶ 21; Def. Appdx. Ex. M. Such leave falls into the unforeseeable category. Pursuant to the regulations, Defendants were permitted to require that Hair comply with the Office's "usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." *See* 29 CFR § 825.303 (c)[9]. Specifically, § 815.303 (c) states:

> When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. For example, an employer may require employees to call a designated number or a specific individual to request leave. However, if an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her condition is stabilized and he or she has access to, and is able to use, a phone. Similarly, in the case of an emergency requiring leave because of a FMLA-qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved. **If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied.**

*Id.* (Emphasis added).

The call-in requirements set forth in the FMLA approval letter, therefore were compliant with the FMLA regulations. Moreover, there is no evidence in the record that such requirements interfered with Hair's FMLA rights to the extent she was denied leave permitted under the Act. Accordingly, summary judgment will be entered in favor of Defendants on Hairs FMLA interference claim.

---

[9]    If the intermittent leave is foreseeable, the regulations also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. *See* 29 CFR § 825.302 (d).

E.     Retaliation Under the ADA, FMLA and PHRA

The FMLA makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).  This provision prohibits retaliation by an employer for the employee's exercise of rights under the FMLA. FMLA retaliation claims focus on an employer's retaliatory intent. Therefore, "courts have assessed these claims through the lens of employment discrimination law." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr*, 691 F.3d 294, 302 (3d Cir. 2012).  As with other retaliation claims, the Court must utilize the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)[10]; *Sherrod v. Philadelphia Gas Works*, 209 F. Supp. 2d 443, 451 (E.D. Pa. 2002).

Retaliation claims brought under the ADA also follow the framework established in *McDonnell Douglas Corp. v. Green. See Jalil v. Avdel Corporation*, 873 F.2d 701, 706 (3d Cir. 1989).  Therefore, Hair must satisfy a three-part test in order to establish a *prima facie* claim of retaliation under the ADA, PHRA, and FMLA. She must prove that (1) she engaged in protected activity; (2) her employer took adverse action after or contemporaneous with her protected activity; and (3) a causal link exists between her protected activity and the employer's adverse action. *Sabbrese v. Lowe's Home Ctrs., Inc.*, 320 F. Supp. 2d 311, 322, (W.D. Pa. 2004) (citing *Abramson v. Wm. Patterson College of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001)).

---

[10]     Claims based on circumstantial evidence have been assessed under the burden-shifting framework established *in McDonnell Douglas Corp. v. Green*, while claims based on direct evidence have been assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989).  *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr*, 691 F.3d at 302.  None of the parties in this instance contend that *Price-Waterhouse* is applicable.

To avoid summary judgment under the third step of the *McDonnell Douglas* framework, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff must adduce evidence sufficient to "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (internal citation omitted). To do so, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (internal quotations and citations omitted). It is not sufficient to show that the employer's decision was wrong, mistaken, imprudent or incompetently made. *Id.*

In order to meet the adverse employment action prong of the *prima facie* case, a plaintiff must demonstrate "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "Although something less than a discharge could be an adverse employment action, a plaintiff must be able to point to a significant action, such as a demotion, involuntary transfer, or loss of other tangible benefits, in order to show that she was constructively discharged." *Barnett v. N.J. Transit Corp.*, 573 F. App'x 239, 243-244 (3d Cir. 2014) (citation and internal quotation marks omitted), *cert. denied*, 135 S. Ct. 1493, 191 L. Ed. 2d 434 (2015).

Hair alleges that the retaliatory conduct included (1) failing to investigate and respond to requests for accommodation or FMLA; (2) excessive discipline; (3) continuing harassment; (4) transferring her to the FACT office; and (5) constructive discharge. The Court has already determined that Hair was properly accommodated by Defendants and that she was granted FMLA leave and the alleged harassment cannot be considered an adverse employment action. The Court will review the remainder of Hair's allegations.

1.    Excessive Discipline

On December 5, 2013, Whiteko issued Hair a verbal warning for failing to abide by the requirements of the office attendance policy by arriving late without notifying the office on several dates prior to her FMLA leave. Def. CSUMF ¶ 37; Def. Appdx. Ex. X. Whiteko also issued Hair a written warning on that same day for arriving late for work on several days after the commencement of her FMLA leave and failing to notify the office that she would be late. *Id.* Whiteko counseled Hair that she must "inform [him] in as far in advance as possible if [she was] going to be late or need to leave early, but no later than the beginning of that work day." *Id.*

Hair argues that Whiteko made the decision to discipline her only after she was approved for FMLA leave, because he thought it unfair that she was given the leave. Notwithstanding the fact that such reprimands were later withdrawn, such discipline does not rise to the level of an adverse employment action. In *Weston v. Commonwealth of Pennsylvania*, 251 F.3d 420 (3d Cir. 2001), the United States Court of Appeals for the Third Circuit court held that a written reprimand placed in an employee's personnel file did not constitute an adverse employment action. *Id.* at 431.

On December 13, 2013, Carnicella notified Hair that her use of a video recorder on December 6, 2013, may have violated County policy and the Pennsylvania Wire Tap Law. Def. CSUMF ¶ 44. Further, Carnicella indicated that her comments made to Kondrla on November

22, 2013, also may have violated County policy. *Id.* The County held the Loudermill hearing on December 20, 2013. Def. CSUMF ¶ 45. As a result of the hearing, Hair was issued a one day unpaid suspension for her comment "sit in your hole and shut up" directed at Kondrla. Def. CSUMF ¶ 46. Though Hair was issued a one day suspension that may be considered a loss of a tangible benefit, the suspension was not related to her exercise of a protected activity.

By letter dated January 27, 2014, Hair was notified that a Loudermill Hearing was scheduled for January 30, 2014, to respond to allegations that she refused to answer phones in the office, slept at her desk, glared at her co-workers and failed to notify co-workers of when she would leave the office. Def. CSUMF ¶ 56. Following the hearing, Hair was issued a written warning for violating County policy by intimidating employees, misusing County time, failing to follow the chain of command, failing to perform job duties, unauthorized absence from work station/area during the workday and for unprofessional behavior. Def. CSUMF ¶ 57; Def. Appdx. Ex. RR. Such discipline did not constitute an adverse employment action.

On March 4, 2014, Debbie McGee filed a Workplace Harassment Complaint Form against Hair alleging Hair made comments to her throughout the day, stared and/or glared at her, refused to perform job tasks, refused to follow scheduling rules and continually attempts to bully and intimidate her. Def. CSUMF ¶ 61; Def. Appdx. Ex. WW. Kondrla also filed a Workplace Harassment Complaint Form against Hair in March of 2014, alleging that Hair made comments to her, stared and smirked at her, and refused to answer the telephone. Def. CSUMF ¶ 65.

A Loudermill hearing was scheduled for March 24, 2014, and Hair admitted that she would not answer the telephone in the office, and opined that she did not have to take her breaks in accordance with the break schedule. Def. CSUMF ¶¶ 66 & 67. Based upon her admissions, Hair received a one (1) day unpaid suspension for intimidating employees, unsatisfactory performance of job duties, misuse of County time, refusal to perform assignments, failing to

abide by office hours and break times and unprofessional communications in the office. Def. CSUMF ¶ 68; Def. Appdx. Ex. CCC. Again, if the one day suspension is considered a loss of a tangible benefit, there is no evidence the suspension was related to Hair's exercise of a protected activity.

The record indicates that Hair had complete disregard to authority in the Office and refused to follow Office procedures for which she was disciplined in June and July of 2014. There is no evidence that such discipline was related to Hair's exercise of a protected activity relevant to this action.

2.     Transfer to FACT

After discussions between Carnicella, Hair's Union Representative, Rose Cindric ("Cindric"), Hair was transferred to the FACT Office on August 28, 2014, as a Transportation Information Specialist. Def. CSUMF ¶ 104; Def. Appdx. Ex. N (Cindric Deposition at pp. 36-37, 67-68). In her new position, Hair was going to make the same amount of money and be entitled to the same benefits in accordance with the Union pay scale. Def. CSUMF ¶ 105. The transfer was in effort to save Hair's job. Def. Appdx. Ex. D (Carnicella Deposition at pp. 36-37). Moreover, the County was entitled to transfer Hair under the CBA. Def. Appdx. Ex. N (Cindric Deposition at pp. 67-68).

Hair's preference to work in the Public Defender's Office is of no moment. A plaintiff claiming retaliation must show that a reasonable employee would have found the alleged retaliatory action "materially adverse" in that it "well might have dissuaded a reasonable worker" from exercising a [protected right]." *See Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006). "A purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not

32

do, either." *Glenn v. Horgan Bros.*, 2005 U.S. Dist. LEXIS 12406, *19-20, (E.D. Pa. June 24, 2005)(internal quotations and citations omitted); *see also, O'Neal v. Brownlee*, 2004 U.S. Dist. LEXIS 24942, No. 03-5535, 2004 WL 2827052, at *6 (E.D. Pa. Dec. 9, 2004)("While in certain circumstances a transfer or reassignment may be materially adverse action, . . . a purely lateral transfer, which does not involve a change in pay or a demotion in any other form, does not constitute an adverse employment action."). The Court, therefore, finds that the transfer to FACT was not a materially adverse employment action.

   3. <u>Constructive Discharge</u>

  Constructive termination occurs where "an employer knowingly permit[s] conditions of discrimination so unpleasant that a reasonable person would have felt compelled to resign." *Barnett*, 573 F. App'x at 244. At the summary judgment stage, "a court must determine whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001). Although the Third Circuit has rejected an "aggravated circumstances" requirement, it has advised that a plaintiff claiming constructive discharge must "demonstrate that the alleged discrimination surpasses 'a threshold of intolerable conditions. *See Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 169 (3d Cir. 2001). Courts apply an objective test to determine if there is a constructive discharge, but common examples of constructive discharge include threatening to fire an employee, urging an employee to resign, demotions, reductions in pay or benefits, involuntary transfer to a less desirable position, or alteration of job responsibilities. *See Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993).

  In this instance, Hair resigned from the FACT Office though her pay, benefits, hours and working conditions were essentially the same as those in the Public Defender's Office. Moreover, she made no complaints about mistreatment or antagonism in the FACT Office. This

Court is unable to find that Hair was constructively discharged from her employment. Hair, therefore is unable to establish a *prima facie* case of retaliation under either the ADA, FMLA or PHRA.

Even assuming that Hair is able to establish a *prima facie* case of retaliation, her claim fails under *McDonnell Douglas*. Establishment of a *prima facie* case raises a presumption of unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). A defendant can overcome that presumption by introducing admissible evidence of non-discriminatory reasons for its actions. *St. Mary's*, 509 U.S. at 507 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)). The defendant has only the burden of production, however; it need not prove that its stated reasons "actually motivated its behavior . . . ." *Fuentes v. Perskie*, 32 F.3d at 763.

If the defendant meets its burden, the plaintiff must then "show by a preponderance of the evidence that the employer's explanation [for its actions] is pretextual (thus meeting the plaintiff's burden of persuasion)." *Id.* Plaintiff does not have to prove that an "illegitimate" motive was the sole reason for the employer's decision; she need only prove that it was a determinative factor in her termination. *Fuentes v. Perskie*, 32 F.3d at 764 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993)).

Defendants have established non-discriminatory reasons for disciplining and/or transferring Hair. The record is rife with evidence of her antagonism toward her co-workers, her complete disregard of office policies, and unprofessional behavior. Conversely, the Court is unable to find any evidence in the record that supports an inference that Defendants held any animus toward Hair specifically because she availed herself of FMLA leave. Hair's retaliation claims under the under the ADA, FMLA and PHRA, therefore, fail.

F.     Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1983

42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "The purpose of Section 1983 is to provide a civil cause of action to protect persons against the misuse of power possessed by virtue of state law and made possible because the defendant was cloaked with the authority of the state." *Douris v. Dougherty*, 192 F. Supp. 2d 358, 363 (E.D. Pa. 2002)(citation omitted). Thus, Section 1983 "provides redress for certain violations of rights arising under the federal constitution or laws of the United States which are caused by persons acting under color of state law." *Id.* To assert a claim under the statute, a plaintiff must demonstrate that he was deprived of a federal constitutional or statutory right by a person who was acting under the color of state law at the time that the alleged deprivation occurred. *See Woodyard v. Cnty. of Essex*, 514 F. App'x 177, 180 (3d Cir. 2013).

To sustain a conspiracy claim under Section 1983, a plaintiff must establish the following: "(1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Marchese v. Umstead*, 110 F. Supp.2d 361, 371 (E.D. Pa. 2000). A § 1983 conspiracy claim, however, is viable only if there has been an actual deprivation of a constitutional or federal statutory right. *Sweetman v. Borough of Norristown, PA*, 554 Fed. Appx. 86, 90 (3d Cir. 2014) (citing *Andree v. Ashland Cnty.*, 818 F.2d 1306, 1311 (7th Cir. 1987)).

This Court has determined that Hair failed to establish a violation of her rights under either the Rehabilitation Act, the ADA or the FMLA. Absent a deprivation of a federal statutory right, Hair's § 1983 conspiracy claim fails as a matter of law.

      G.     <u>Intentional Infliction of Emotional Distress</u>

A cause of action for intentional infliction of emotional distress arises when a defendant, by extreme and outrageous conduct, intentionally or recklessly causes severe emotional distress to another resulting in bodily harm. *Field v. Philadelphia Electric Co.*, 565 A.2d 1170 (Pa. Super. 1989). Only cases demonstrating the most egregious conduct will form a sufficient basis for intentional infliction of emotional distress. *See Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970). Because this Court finds that Hair failed to establish a cause of action based upon extreme and outrageous conduct by the individual Defendants, her claim of intentional infliction of emotional distress fails as a matter of law[11].

      H.     <u>Hair's Motion for Partial Summary Judgment</u>

Having determined that the Defendants are entitled to Summary Judgment, Hairs Motion for Partial Summary Judgment will be denied.

**V.**      **CONCLUSION**

Based upon the foregoing, Hair's motion for partial summary judgment shall be denied and Defendants' motion for summary judgment shall be granted. An appropriate order follows.

                       s/ DAVID STEWART CERCONE
                       David Stewart Cercone
                       United States District Judge

---

[11]    The Court finds no need in this instance to address the immunity issue.

cc: Jeremy Donham, Esquire
Marie Milie Jones, Esquire
Michael R. Lettrich, Esquire

*(Via CM/ECF Electronic Mail)*